UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KARL F. VINSON,

                    Petitioner,                  Case No. 14-cv-14542

v                                          Honorable Thomas L. Ludington

THOMAS MACKIE,

                    Respondent.
_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS**

      Petitioner Karl Vinson, presently confined at the Carson City Correctional Facility in Carson City, Michigan, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed through his attorneys, David A. Moran and Imran J. Syed of the Michigan Innocence Clinic, petitioner challenges his conviction for first-degree criminal sexual conduct (CSC), Mich. Comp. Laws § 750.520(b)(1)(a)(victim under 13 years of age), and breaking and entering a building with the intent to commit a felony (CSC) therein, Mich. Comp. Laws § 750.110. For the reasons which follow, the petition for a writ of habeas corpus will be denied pursuant to 28 U.S.C.§ 2244(b)(4).

**I.**

**A.**

      The relevant facts of Petitioner's conviction were outlined by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

This matter arises from the brutal rape of a nine-year-old female victim in her own bed.  The victim was asleep when she awoke to find a man in her bedroom. She indicated that she was able to see his facial features because lights, both within the home and outside, provided illumination within the room.  The victim identified Vinson, claiming that she had seen him previously and she recognized his voice, although she could not immediately recall his name.  She was further able to identify Vinson as her assailant because she was familiar with him since his wife had babysat her and her younger sister.   Vinson's mother and her husband provided an alibi for him at trial, indicating that he was sleeping on their couch at the time of the assault.

Following the assault, the victim was taken to the hospital.  She experienced a bloody discharge and a deep cut requiring surgical repair.  A specimen of vaginal secretions was obtained from the victim revealing the presence of nonmoving sperm; however, the specimen was not provided for forensic testing.

Fingerprints were not able to be recovered from the window casing where the perpetrator entered the victim's bedroom.  The victim's bed sheet, containing a "kind of wet" bloodstain, was taken into evidence.  The bed sheet was examined by Sergeant Ronald Badascewski of the Crime Lab Serology and Trace Evidence Unit. Sergeant Badascewski performed an acid phosphatase test on the stained area with a positive result for blood and seminal fluid.  After washing the stain from the portion of the sheet, Sergeant Badascewski placed the washing on a microscope slide and found one complete sperm.  He then turned over a portion of the stain to Paula Lytle, a registered medical technologist, in order to determine the blood type of the stained area.  Lytle detected the presence of blood type O from the sample, which was consistent with the victim.   At trial, Lytle acknowledged that she only received one sample from the bed sheet stain and that she did not receive the sperm recovered by Sergeant Badascewski for testing. When questioned by the prosecutor, Lytle opined that the sample she examined contained a mixture or combination of blood and seminal fluid.

Lytle also obtained a blood and saliva sample from the victim and determined that her blood type was O and that she was a secretor.  A secretor is defined as:

> An individual whose bodily fluids (saliva, semen, vaginal secretions) contain a water-soluble form of the antigens of the ABO blood group. Secretors constitute 80% of the population.  In forensic medicine, the examination of fluids has enhanced the ability of law enforcement officials to develop identifying information about perpetrators and narrow a field of suspects. [See mediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=80515 (accessed May 24, 2012).]

Blood and saliva samples were also obtained from Vinson.  Lytle determined at that time that Vinson's blood type type was AB and that he was a nonsecretor, defined as "[a]n individual [whose bodily fluids] and saliva that do[ ] not contain antigens of the ABO blood group." *Id*.

During closing argument at trial, the prosecutor stated that the bed sheet contained a mixture of blood and seminal fluid and argued that the stain came from Vinson and the victim.  The prosecution stated that Vinson was a nonsecretor "along with 20 percent of the population."   The implication of this statement was that Vinson's status as a nonsecretor explained the absence of any detectable AB antigens from the stained bed sheet.  The prosecutor also noted that the victim knew Vinson and had no motivation to lie regarding his identity as the perpetrator and questioned the veracity of Vinson's alibi defense.

Although the jury initially requested the testimony of all the expert witnesses, they rescinded the request and subsequently found Vinson guilty of first-degree CSC and breaking and entering.  Along with the denial of Vinson's initial appeal to this Court following his convictions, he also subsequently filed three motions for relief from judgment and a federal petition for habeas corpus, all of which were unsuccessful. Vinson later learned that the physical evidence, including the bed sheet, was destroyed by police.  In 2009, Vinson obtained retesting and analysis confirmed that his blood type is AB.  Contrary to the evidence at trial, the 2009 analysis revealed that Vinson actually is a secretor.  These results were confirmed by an independent laboratory.

In September 2009, Vinson again sought relief from judgment premised on prosecutorial misconduct, ineffective assistance by his trial and appellate counsel, and newly discovered evidence of his status as an AB secretor.  The matter came back before the original trial judge, who questioned the ability to demonstrate Vinson's innocence.   The trial judge speculated that Vinson could have been using a condom at the time of the assault, but defense counsel responded that, at trial, the prosecution had argued that the semen had come from the rapist.  The trial judge ordered the Michigan State Police (MSP) to determine Vinson's blood type and secretor status, and on August 20, 2010, the MSP report confirmed that Vinson is an AB secretor of ABO antigens.

At the ensuing evidentiary hearing, Lytle was called to testify.  Following her confirmation of her trial testimony along with the testing originally conducted and results, she acknowledged recent testing demonstrating Vinson's secretor status. Following questioning, Lytle opined that testing on a semen stain differed from the testing performed on a blood stain to determine blood type.  Lytle affirmed that the sample tested contained a mixture of semen and blood and, when asked where the type O in the stain originated, Lytle replied that it could not have come from Vinson, but that it could have come from the semen donor and/or the victim. Further, if the type O detected in the stain originated from the victim, then it would have come from her bodily fluid and not her blood.  Lytle further opined,

on the basis of the results obtained through the acid phosphatase test performed by Sergeant Badascewski, that there was a very high presence of semen in the stain that she tested. She deemed it unlikely that the victim, due to her young age, would have vaginal secretions. Lytle confirmed that she did not detect any AB antigenic substances.

On cross-examination, Lytle acknowledged she did not test the "exact same piece of material" that Sergeant Badascewski tested and detected the presence of seminal fluid. As Lytle did not repeat the test performed by Sergeant Badascewski or examine the section of the bed sheet she received for sperm cells, she could not determine if the material she received contained semen. Lytle further admitted that she might have cut additional samples from the bed sheet and performed additional testing had she known Vinson's status as a secretor. Upon questioning by the trial judge, Lytle indicated that she had originally testified that Vinson was a nonsecretor and that she now believed that the O antigen detected could have been from a male donor of the semen. When asked if she had known Vinson was a secretor during the original trial, Lytle indicated she "would testify that his blood type was not detected ... and he could not be the donor of the O substance in that stain."

Additional hearings were conducted, with defense counsel presenting Arthur Young, an expert in forensic serology, who confirmed Vinson's status as an "ABO type AB secretor" and that Vinson was a "very strong secretor." Young further testified that he would have expected semen to be mixed in with the blood on the bed sheet and that the O antigens detected were more probably from semen rather than the victim's vaginal secretions. In contrast, the prosecution's witness Connie Swander of the MSP laboratory indicated that it was possible that the O antigen detected was derived from the victim's blood. Swander opined that the only known fact was the presence of an O antigen but that its origin could not be ascertained. She further opined that, despite the victim's young age, vaginal fluid could be in the stain. Swander did admit that she could not rule out the possibility that the blood type of the perpetrator of the assault was O.

*People v. Vinson*, No. 303593, 2012 WL 3046236, at *1-3, (Mich. Ct. App. July 26, 2012).

After holding the post-conviction hearing, the trial court denied petitioner's motion for

relief from judgment, finding:

But the question is, would this new evidence have caused a different result? Now, that's what I understand the standard is.

That young lady's identification the -- only thing that the scientific evidence would have done would have bolstered her testimony. And in this case, I don't think anybody could conclude. And as I remember Paula Lytle testifying here

- 4 -

recently, nobody could say that that was from the rapist.  I don't remember her saying that.

And this Court is not convinced that it would cause a different result in this case. And because of that, I'm going to deny your motion.

*See* 3/28/2011 Tr. P. 40, ECF No. 5-25.

In response to the denial Petitioner filed a motion for leave to appeal to the Michigan Court of Appeals.  The Michigan Court of appeals denied Petitioner's motion upon finding that the new evidence "does not serve to establish Vinson's 'actual innocence.'" *People v. Vinson*, No. 303593, 2012 WL 3046236, at * 1, 7, (Mich. Ct. App. July 26, 2012).  The Michigan Supreme Court also denied Petitioner leave to appeal.  *See People v. Vinson*, 843 N.W.2d 493 (Mich. 2014); *reconsideration denied*, 847 N.W.2d 241 (Mich. 2014).

## B.

In 2014, Petitioner filed a motion with the United States Court of Appeals for the Sixth Circuit for permission to file a second or successive petition.   In this proposed successive petition, Petitioner presented five claims: (1) that his trial counsel was ineffective for failing to hire his own expert to test Petitioner's secretor status; (2) that his appellate counsel was ineffective for failing to raise the first claim on direct appeal; (3) that his trial counsel was ineffective for failing to adequately cross-examine the State's forensic witness; (4) that his appellate counsel was ineffective for failing to raise the inadequate-cross-examination claim on direct appeal; and (5) that Petitioner is actually innocent.

The Sixth Circuit authorized Petitioner Vinson to file a second petition based on his claims that his trial counsel was ineffective for failing to adequately cross-examine the State's forensic witness,  that his appellate counsel was ineffective for failing to raise the inadequate-cross-examination claim on direct appeal, and that he is actually innocent. *See In Re Karl Vinson*,

No. 14-2521, * 4-6 (6th Cir. Sept. 24, 2015).  The Sixth Circuit denied Petitioner permission to seek habeas relief on his first two claims because he had already raised them in his prior habeas petition. *Id.* at *4, 6.

In response Petitioner filed the current § 2254 petition on December 1, 2014, asserting all five of his proposed claims, including the two that the Sixth Circuit did not authorize him to file. *See* ECF Nos. 1-2.  On April 13, 2016 Respondent filed its response through the Attorney General's Office, arguing that Petitioner's claims are barred by 28 U.S.C. § 2244(b)(4), are time-barred, procedurally defaulted and/or lack merit.

## II.

Petitioner's successive habeas petition will be dismissed pursuant to 28 U.S.C. § 2244(b)(4) because his claims fail to satisfy the requirements for filing a second or successive habeas petition.  In relevant part, § 2244(b)(2) provides:

> A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless--
>
> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)
> > (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
> >
> > (ii)  the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

In granting Petitioner leave to file his successive habeas petition, the Sixth Circuit determined that petitioner had made a *prima facie* showing that the application satisfied the

requirements of 28 U.S.C. § 2244. *See Ferrazza,* 36 F. Supp. 2d at 973. "'Prima facie' in this context means simply sufficient allegations of fact together with some documentation that would warrant a fuller exploration in the district court." *In re Lott*, 366 F.3d 431, 433 (6th Cir. 2004) (internal quotation omitted). Such a "'prima facie showing' ... is not a difficult standard to meet." *Id.* at 432.

28 U.S.C. § 2244(b)(4) requires a district court to "dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section." See *In re McDonald,* 514 F.3d 539, 543 (6th Cir. 2008). Even after a court of appeals has certified a successive motion on the basis that the movant has made a *prima facie* showing that the statutory standard of § 2244(b) has been satisfied, it is appropriate for a district court to dismiss the petition or motion if the merits of the successive petition or motion do not ultimately satisfy that same statutory standard under § 2244(b). *See Tyler v. Cain,* 533 U.S. 656, 661, n. 3 (2001). Petitioner's petition does not satisfy these requirements.

### A.

Petitioner's first two claims must be dismissed because they have not been certified by the Sixth Circuit. Before a second or successive habeas petition is filed in a federal district court, a habeas petitioner must move in the appropriate court of appeals for an order authorizing the district court to consider the petition. 28 U.S.C. § 2244(b)(3)(A); *Stewart v. Martinez-Villareal,* 523 U.S. 637, 641 (1998). A federal district court does not have jurisdiction to entertain a successive post-conviction motion or petition for writ of habeas corpus in the absence of an order from the court of appeals authorizing the filing of such a successive motion or petition. *See Ferrazza v. Tessmer*, 36 F. Supp. 2d 965, 971 (E.D. Mich. 1999).

In the present case, the Sixth Circuit has granted the petitioner permission to file his second petition pursuant to § 2244(b)(3)(A) with respect to claims three, four and five contained within the Sixth Circuit Court of Appeal's order. *See* (9/24/15, Sixth Cir. Ord., Docket No. 14-2521, p. 4.).   On the other hand, the Sixth Circuit denied Petitioner leave to restate claims that trial counsel was ineffective for failing to obtain an expert to test the petitioner's secretor status and that appellate counsel was ineffective for failing to raise this claim on the petitioner's direct appeal. The Court therefore does not have jurisdiction to hear those claims, and they must be dismissed. *See White v. Carter*, 27 F.App'x. 312, 313-14 (6th Cir. 2001).

## B.

Petitioner also raises two claims asserting that his trial counsel was ineffective for failing to cross-examine the prosecution's forensic witness and that his appellate counsel was ineffective for failing to raise this issue on his direct appeal.   To show he was denied the effective assistance of counsel under federal constitutional standards, a petitioner must satisfy a two prong test.  First, a petitioner must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In so doing, a petitioner must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*.  In other words, a petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689.  Second, a petitioner must show that such performance prejudiced his defense. *Id*.  To demonstrate prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.  The Supreme Court's holding in *Strickland* thus places the burden

on a petitioner raising a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009). The *Strickland* standard applies as well to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt,* 395 F.3d 602, 617 (6th Cir. 2005).

Furthermore, on habeas review, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. at 123 (internal quotations omitted).  "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123.  Consequently, the § 2254(d)(1) standard applies a "doubly deferential judicial review" to a *Strickland* claim brought by a habeas petitioner. *Id.*  This means that on habeas review of a state court conviction, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101.  Because of this doubly deferential standard, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Harrington v. Richter*, 562 U.S. at 105.  A reviewing court must not merely give defense counsel the benefit of the doubt, but must also affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did. *Cullen v. Pinholster,* 131 S. Ct. 1388, 1407 (2011).

Petitioner claims that his trial counsel was ineffective for failing to adequately cross-examine laboratory specialist Paula Lytle at trial. Petitioner specifically claims that his trial attorney should have asked Lytle who she believed was the most likely donor of the O-type antigens in the stain, and alleges that, if asked this question, Lytle would have responded that "the rapist" was the most likely source of the O-type antigens in the stain. Petitioner further argues that because he has an AB blood-type, and there was only one perpetrator in this case, he believes that asking this one question would have led the jury to exonerate him. Petitioner relies on Lytle's post-conviction evidentiary hearing testimony in support of his claim.

However, as respondent argues in his brief, the hearing testimony did not confirm his assertion that, if asked, Lytle would have testified that "the rapist" was definitively the source of the O-type antigen. The colloquy at issue is as follows:

> Q: And in fact, at the time, it was likely that it was an O secretor who left that sample; is that right?
>
> A: I believe it was definitely an O secretor, the donor of the semen *and/or the victim showing up in there*.
>
> Q: But given the acid phosphate test results, it's likely that the rapist in this case was an O secretor; is that fair to say?
>
> A: With the strong AP reaction, then I would suspect I am picking up, you know, some type from the donor of the sperm.
>
> Q: And if you were asked these questions at the original trial, you would have explained all that, wouldn't you have?
>
> A: Yes.
>
> Q: But none of the attorneys asked you about any of that, did they?
>
> A: No they did not.

9/21/10 Tr. at 30-31, ECF No. 5-18 (emphasis added).

"[C]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Id.*

Petitioner has not demonstrated that trial counsel was ineffective for failing to ask Ms. Lytle who she believed was the most likely donor of the O-type antigens in the stain, because he has failed to show that she would have given an exculpatory response. Ms. Lytle testified at the post-conviction hearing that the O-type antigen could have come from either the rapist or the victim. *Id.* The victim has O-type blood and is an O-type secretor. Connie Swander, Acting Assistant Division Director in charge of the Michigan State Police forensic science laboratories, testified that the O-type antigens detected in the stain could have come from the victim's red blood cells, vaginal fluid, saliva, urine, or any other bodily fluids or cells from her body. *See* 12/3/31 Tr. 28-36, ECF No. 5-20. Finally, the portion of the bed sheet that Sergeant Badascewski provided to Lytle was different from the section he tested for the presence of semen, and Lytle did not sample for seminal fluid before conducting the test to determine blood type.

Petitioner's ineffective assistance of trial counsel claim must fail, because even if counsel was deficient in failing to ask Ms. Lytle to speculate about the likely donor of the O-type antigen on the bed sheet, Petitioner has failed to demonstrate any reasonable probability, based on the evidence presented at trial and at the post-conviction hearing, that the cross-examination of this witness by defense counsel would have changed the result of the proceeding. *Moss v. Hofbauer,* 286 F.3d 851, 866 (6th Cir. 2002). Indeed, it is equally as likely that Petitioner's trial counsel intentionally chose not to ask the question to avoid a response that was not helpful to Petitioner.

- 11 -

Just as Petitioner has not shown that trial counsel was ineffective for failing to cross-examine Ms. Lytle about who the donor of the O-type antigens was in the stain recovered from the crime scene, Petitioner has not shown that his appellate counsel was ineffective for failing to raise the claim on direct appeal. The Sixth Amendment guarantees a defendant the right to the effective assistance of appellate counsel on appeals of right. *See Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985). However, court appointed counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Because Petitioner has failed to show that his trial counsel was ineffective, Petitioner is unable to establish that appellate counsel was ineffective for failing to raise his ineffective assistance of trial counsel claim on his direct appeal. *See e.g. Fautenberry v. Mitchell,* 515 F.3d 614, 642 (6th Cir. 2008); *Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999).

## C.

Finally, Petitioner alleges that his continued incarceration is unconstitutional because he is actually innocent. Petitioner asserts that he is entitled to relief on this claim because there is new evidence that could not have been previously discovered through the exercise of due diligence. Specifically, Petitioner claims that evidence shows that he is a Type-AB secretor, and therefore it is "all but scientifically impossible that [he] could have been the perpetrator of the crimes for which he was convicted." *See* Memorandum in Support of Petition for Writ of Habeas Corpus, p. 22, ECF No. 2.

## i.

In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), the Supreme Court held that claims of actual innocence based on newly discovered evidence fail to state a claim for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal

- 12 -

proceeding.  Federal habeas courts sit to ensure that individuals are not imprisoned in violation of the constitution, not to correct errors of fact. *Id., see also McQuiggin v. Perkins,* 133 S. Ct. 1924, 1931 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.").  Freestanding claims of actual innocence are thus not cognizable on federal habeas review, absent independent allegations of constitutional error at trial. *See Cress v. Palmer,* 484 F.3d 844, 854-55 (6th Cir. 2007)(collecting cases).

Moreover, the Supreme Court's subsequent decision in *House v. Bell*, 547 U.S. 518 (2006) does not alter this Court's adjudication of Petitioner's claim, as Petitioner argues.  In *House* the Supreme Court declined to resolve whether a habeas petitioner may bring a freestanding claim of actual innocence. *Id.* at 554-55.  Although the Supreme Court noted in *House* that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim," *Id.* (quoting *Herrera,* 506 U.S. at 417), the Supreme Court has declined to recognize a freestanding innocence claim in habeas corpus, outside of the death-penalty context.  Petitioner is thus not entitled to relief for his freestanding actual innocence claim. *See Wright v. Stegall*, 247 F.App'x. 709, 711 (6th Cir. 2007).

## ii.

Even considering the merits of Petitioner's actual innocence claim does not entitle him to any relief.  In rejecting Petitioner's actual innocence claim in his post-conviction appeal, the Michigan Court of Appeals stated as follows:

The burden is on Vinson, "on all parts of the *Cress* test,[2] ... to make an affirmative showing that [he] "could not, using reasonable diligence, have discovered and produced the evidence at trial[.]" *Rao*, 491 Mich. at 289,[3] citing *Cress*, 468 Mich. at 692. As our Supreme Court noted, even if a defendant is not aware "of the actual medical information" it "begs the question why defendant lacked awareness at the time of trial[.]" *Rao*, 491 Mich. at 287 (emphasis in original). If testing of his secretor status was as pivotal at trial as is now claimed on appeal, reasonable diligence would have required, at the very least, that Vinson request independent laboratory testing. *Id.* at 290. He was certainly aware of the evidence, the manner of testing, and that results contrary to those obtained by the prosecution's witness could have provided him with support for his defense that he was not the perpetrator. Yet, Vinson fails to offer any viable reason to explain why he did not seek independent testing at the time of trial. When viewed in the context of reasonable diligence, Vinson should have minimally procured independent testing or sought the trial court's assistance in procuring such testing. "Michigan courts have held that a defendant's awareness of the evidence at the time of trial precludes a finding that the evidence is newly discovered, even if the evidence is claimed to have been 'unavailable' at the time of trial." *Id.* at 282.

Additionally, not only were elements one and three not satisfied, but we also hold that this new evidence would not make a different result probable on remand. Our review of the original trial transcripts does not support Vinson's contention that the prosecution's case hinged on the forensic evidence. Rather, the prosecutor placed significant emphasis on the victim's identification of Vinson as the perpetrator of the rape. In actuality, very little testimony was elicited regarding Vinson's alleged status as a nonsecretor and its possible relationship to the physical evidence.

It is necessary to recognize that we are not concerned with how the alleged new evidence would have impacted the jury's determination at the original trial. Rather, we are required to determine whether the evidence of Vinson's status as a secretor would make a different result probable upon retrial. Lytle acknowledged at the evidentiary hearing that she was uncertain whether the material or sample she tested actually contained seminal fluid. The portion of the bed sheet that Sergeant Badascewski provided to Lytle was different from the section he tested, and Lytle did not sample for seminal fluid before conducting the test to determine blood type. The intact sperm sample that Sergeant Badascewski recovered was never tested. In addition, we cannot ignore that the victim positively identified Vinson as the rapist on the basis of her prior familiarity with him and her ability to observe him during the assault and identify his features and voice. This identification is not refuted by the scientific evidence as it is no longer possible to

---

[2] *People v. Cress,* 468 Mich, 678, 664 N.W. 2d 174 (2003).

[3] *People v. Rao,* 491 Mich. 271, 815 N.W. 2d 105 (2012).

ascertain with certainty what substance in the sample resulted in the detection of the O antigen.

*Vinson*, 2012 WL 3046236, at *6.

Petitioner's contention that his status as a secretor constitutes newly discovered evidence is unfounded for the reasons stated by the Michigan Court of Appeals. Specifically, Petitioner cannot show that he exercised reasonable diligence because, at the time of trial, he knew of the evidence, the manner of testing, and that any findings contrary to the results obtained by the prosecution's witness would "have provided him with support for his defense that he was not the perpetrator." *Vinson*, 2012 WL 3046236, at *6. Petitioner's claim of newly discovered evidence is thus without merit.

Furthermore, the evidence does not demonstrate Petitioner's actual innocence. Because "[t]he portion of the bed sheet that Sergeant Badascewski provided to Lytle was different from the section he tested, and Lytle did not sample for seminal fluid before conducting the test to determine blood type" and due to the possibility that the O antigen came from the victim, Petitioner's contention that it is scientifically impossible for a reasonable trier of fact to find that he was is perpetrator of the crime is unfounded. Lytle determined that there were O-type antigens present in the stain, indicating that the non-blood fluids came from a person with O-type blood. 9/21/2010 Tr. p. 28, ECF No. 5-18. Such secretions would include saliva, vaginal secretions, perspiration, and tears. *Id.* at 29. Lytle did not test for sperm *Id.* at 25. It is undisputed that the victim has O-type blood and is an O-type secretor. *See* Trial Tr. pp. 75-76, ECF No. 4. Connie Swander, Acting Assistant Division Director in charge of the Michigan State Police forensic science laboratories, testified that, based on the testing performed in 1986 by Lytle, the O-type antigens detected in the stain could have come from the victim's red blood cells, vaginal fluid, saliva, urine, or any other bodily fluids or cells from her body. 12/3/2010 Tr.

- 15 -

pp. 35-37, ECF No. 5-20.  Because the O antigens could have come from the victim, Petitioner's AB secretion status does not rule him out as the perpetrator of the crime.

Furthermore, the trial court placed great emphasis on the compelling testimony of the victim in finding support for the petitioner's convictions, and "the testimony of a single, uncorroborated prosecuting witness or other eyewitness is generally sufficient to support a conviction." *Brown v. Davis*, 752 F.2d 1142, 1144 (6th Cir. 1985) (internal citations omitted). Here, the victim specifically identified Petitioner as her attacker, testifying that she had seen him previously, that she recognized his voice, and that she was familiar with him since his wife had babysat her and her younger sister. *See People v. Vinson*, No. 303593, 2012 WL 3046236, at *1 (Mich. Ct. App. July 26, 2012).  Finally, any actual innocence claim is undercut by Petitioner's own admissions to his prison psychologist that he had sexual contact with the victim on a different occasion. *See* Psych. Rep., ECF No. 15.

For all of these reasons, Petitioner's actual innocence claim is without merit.

### III.

Before a petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 327 (2003).  In applying

that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37.

When a court denies relief on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the court was correct in its procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). When a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petition should be allowed to proceed further. In such a circumstance, no appeal would be warranted. *Id.*

Having considered the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is not warranted in this case. On the other hand, Petitioner will be granted leave to appeal *in forma pauperis*. Whereas a certificate of appealability may only be granted if petitioner makes a substantial showing of the denial of a constitutional right, a court may grant IFP status if it finds that an appeal is being taken in good faith. *Id.* at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. *Foster,* 208 F. Supp. 2d at 765. Although jurists of reason would not debate this Court's resolution of Petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and the petitioner may proceed *in forma pauperis* on appeal. *Id.*

**IV.**

- 17 -

Accordingly, it is **ORDERED** that Petitioner's petition for a writ of habeas corpus is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED**.

It is further **ORDERED** that Petitioner is **GRANTED LEAVE** to appeal *in forma pauperis.*

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: December 6, 2016

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 6, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager

---